# Louis M. Cavanaugh et al v. Annie Laurie Barrow Davis.

No. A-2819. Decided January 3, 1951.
Rehearing overruled February 21, 1951.
(235 S. W., 2d Series, 972.)

574

*Sneed & Vine, Silas J. Maxwell, Anna L. Sanbo* and *Louis Scott Wilkerson,* all of Austin, for petitioners.

The Court of Civil Appeals erred in holding that the evi-

dence conclusively established as a matter of law the essential fact that George Ann Barrow agreed to adopt respondent. Lockley v. Page, 142 Texas 594, 180 S. W. 2d 616; Wisdom v. Smith, 146 Texas 420, 209 S. W. 2d 164; Cheney v. Coffey, 131 Texas 212, 113 S. W. 2d 162.

*Archer & Archer* and *Fancher Archer*, all of Austin, for respondent.

The Court of Civil Appeals was correct in holding that the undisputed evidence conclusively established as a matter of law that the essential elements of adoption by estoppel were present and in equity it will be presumed everything which honesty and good conscience required was done to effect such adoption. Garcia v. Quiroz, 228 S. W. 2d 953, writ of error denied; Roberts v. Roberts, 223 Fed. 775, cert. denied, 239 U. S. 639, 36 Sup. Ct. 160; Kay v. Niehaus, 298 Mo. 201, 249 S. W. 625.

MR. JUSTICE CALVERT delivered the opinion of the Court.

This was an action to declare heirship brought in the County Court of Travis County by Annie Laurie Barrow Davis under Chapter 23, Title 54, R.C.S. 1925, in which she sought to have the court declare that she was an adopted daughter and the only heir at law of George Ann Barrow who died intestate and who, at the time of her death, was the owner of an undivided one-half interest in certain real property situated in the City of Austin.

The County Court entered judgment declaring the collateral kin of the deceased to be her heirs, and establishing the relationship of respondent to the deceased as that of niece rather than that of daughter. On appeal to the district court and in a trial before the court without the aid of a jury judgment was there entered declaring the collateral kin of the deceased to be her heirs and establishing the relationship of respondent to the deceased to be that of niece.

The Court of Civil Appeals held that the evidence conclusively established an adoption by estoppel as a matter of law and reversed the judgment of the district court and rendered judgment establishing respondent's status as a child of George Ann Barrow. 231 S. W. (2d) 959.

Prior to the repeal in 1931 of Arts. 42, 43 and 44 of the Revised Civil Statutes of 1925 (the statutes in effect at the time this adoption is alleged to have occurred) and the enact-

ment at the same time of statutes providing for adoption by judicial proceedings, the statutory method of effecting an adoption was by the execution, authentication or acknowledgment and recording by the adopting parent of a written instrument of adoption. When the statutory requirements were fully and strictly complied with the adoption was, of course, complete. Strict compliance with the statutes, however, was not in all cases essential to the creation of an adoptive status. Thus, where the parties acting in good faith under an instrument of adoption, not filed of record as required by the statute but found by the jury to have been executed and acknowledged, assumed and lived in a relationship wholly consistent with that of parent and child this Court upheld the adoptive status of the child on the ground that those claiming under the adoptive parents were estopped to deny the validity of the instrument of adoption and its recordation. It was said by the Court that to hold otherwise would work a fraud upon the rights of the child which a court of equity would not permit. Cubley v. Barbee, 123 Texas 411, 73 S. W. 2d 72. Thus, also, where a child was delivered by its natural parent into the custody of others, under an agreement between the parent and the custodians that the child would be adopted, and the custodians and the child thereafter assumed and lived in a relationship wholly consistent with that of parent and child, this court held that the adoptive status of the child would be upheld. Jones v. Guy et al., 135 Texas 398, 143 S. W. 2d 906, 142 A.L.R. 77. This holding was also based upon the equitable doctrine of estoppel.

Under the statutes and the cases referred to it was incumbent upon respondent to plead and prove according to recognized rules of law and evidence that: (1) George Ann Barrow executed, acknowledged and filed a statutory instrument of adoption in the office of the County Clerk; or (2) George Ann Barrow undertook to effect a statutory adoption but failed to do so because of some defect in the instrument of adoption or in its execution or acknowledgment, or because of failure to record it; or (3) George Ann Barrow agreed with respondent, or with respondent's parents or with some other person in loco parentis that she would adopt respondent. The effort to comply with the statute in the second instance and the agreement to adopt in the third instance are a necessary predicate for the interposition of the equity powers of the courts to decree an adoption by estoppel in favor of one who, acting under and by virtue of such defective proceeding or such agreement, confers affection and benefits upon the other.

■ In no case has this Court upheld the adoptive status of a child in the absence of proof of an agreement or contract to adopt. In the case of Jones v. Guy et al, supra, there were both allegations in the pleadings and substantial evidence of the existence of an agreement to adopt made by the adopters with the natural parent of the child. The necessity for the existence of a contract or agreement has been recognized by the courts of many of our states. To cite a few, see Niehaus v. Madden et al, 348 Mo. 770, 155 S. W. 2d 141; Hutton v. Busaytis et al, 326 Ill. 453, 158 N. E. 156; In Re Norman's Estate, 209 Minn. 19, 295 N. W. 63; Clemons v. Clemons, 193 Okla. 412, 145 Pac. 2d 928. For many other cases to the same effect, see 171 A.L.R. 1321; 142 A.L.R. 102; 27 A.L.R. 1350.

From the pleading on which she went to trial it is obvious that respondent recognized that the existence of an agreement to adopt her was essential to the establishment of her claim to the status of an adopted child. She alleged that "George Ann Barrow took this plaintiff from her natural mother, Lou Cavanaugh Harvey, when plaintiff was an infant only a few days old with the understanding and agreement between Lou Cavanaugh Harvey and George Ann Barrow that George Ann Barrow would adopt plaintiff and make her her adopted daughter * * * that pursuant to such agreement and undertaking the natural mother of plaintiff delivered her to said George Ann Barrow with whom plaintiff continued to live until she was grown and married * * *"; that thereafter she lived with George Ann Barrow and her husband William Barrow as their daughter, she calling them "mama" and "daddy" and they introducing and holding her out to the public as their daughter; that the Barrows fed, clothed and educated her and she in turn waited on them when they were sick and did all the kinds of work they required of her and such as was ordinarily required of a child by a parent.

The record reflects without dispute that respondent was born in August or September, 1924, the natural daughter of Lindsay Harvey and Lou Cavanaugh Harvey, a sister of George Ann Barrow; that Lindsay Harvey, her father, died before respondent's birth and Lou Harvey, her mother, died when respondent was about fifteen months old; that after her mother's death respondent lived a portion of the time with George Ann (then the wife of Israel Whitley) and a portion of the time with Eugene Cavanaugh, an uncle; that having secured a divorce from Israel Whitley in June, 1929, George Ann married William Barrow on August 9, 1930, and about fifteen months there-

after when respondent was about seven years of age she went to live with the Barrows where she continued to reside until George Ann's death in January, 1947, William having died in July, 1943.

Having entered judgment as heretofore indicated the trial judge, in response to a request therefor, filed findings of facts and conclusions of law. Only finding of fact Number 10 and conclusion of law Number 4 have any material bearing on the issue to be decided here. The finding of fact is as follows:

"10. The evidence is insufficient to sustain a finding that George Ann Barrow ever agreed with any person at any time to adopt the plaintiff herein."

The conclusion of law is as follows:

"11. The necessary elements for an adoption of plaintiff by estoppel being absent, the facts do not justify a decree establishing same as prayed for by plaintiff."

The holding of the Court of Civil Appeals that the evidence conclusively established an adoption by estoppel as a matter of law and its judgment reversing the judgment of the trial court and rendering judgment for respondent necessarily negative the existence of any evidence of probative force in support of the trial court's finding of fact Number 10. Whether there is any such evidence is a question of law which this Court may review.

■ Both of the parties to the alleged agreement were dead at the time of the trial and no direct evidence of the agreement was offered on the trial. The inference from the record is that the agreement was oral but no witness testified to having heard any conversation which could be made the basis of such an agreement. It was not necessary, however, that there be direct evidence of the agreement. It like any other ultimate fact could be proved by the acts, conduct and admissions of the parties and other relevant facts and circumstances. Niehaus v. Madden et al, 348 Mo. 770, 155 S. W. 2d 141; Crilly v. Morris, 70 S. W. 584, 19 N. W. 2d 836; Johnston v. Ericksson, 71 S. D. 268, 23 N. W. 2d 799; Roberts v. Sutton, 317 Mich. 458, 27 N. W. 2d 54; Toler v. Goodin, 200 Ga. 527, 37 S. E. 2d 609; 2 C. J. S., Sec. 26, p. 396; Roberts v. Roberts, 223 Fed. 775, 138 C. C. A. 102, Certiorari denied, 239 U. S. 639, 36 Sup. Ct. 160, 60 L. Ed. 481.

Was the agreement as alleged by respondent conclusively established by the collateral facts and circumstances in evidence? All the evidence, oral and written, offered on the issue on the trial of the case was offered by respondent. Several witnesses testified but it will be necessary to detail the testimony of but a few.

The testimony of the witnesses established without dispute that until respondent went to live with the Barrows in 1931 she went under the surname of Harvey but that within a short time thereafter she became known in the neighborhood and in school as Annie Laurie Barrow; that she was reared, cared for, clothed and educated by the Barrows and that she, in turn, performed household and other duties about the home and always called George Ann "mama" or "mom" and William "daddy" or "dad". Only one of the witnesses ever heard George Ann refer to respondent as "daughter" and none of the witnesses testified to having heard William use this term in addressing her.

Eula Swann, a sister of George Ann and Lou Harvey testified that she lived in the house with Lou Harvey at all times from the birth of Annie Laurie until the death of Lou; that "Lou Harvey did not talk to me about raising Annie Laurie at all. * * * I didn't hear her talk to anyone about taking care of Annie Laurie in case anything happened to Lou. * * *"; that Lou was in ill health but "George Ann did not take care of Annie Laurie. She was there with me"; that Lou "was in bed off and on in the fall of that year she died * * * but she fell dead when she died. I was at home there with my father when Lou died, in the house with her. She fell dead right behind me."

Rosa Barrow Stewart, a sister of William Barrow, testified that "George Ann always told me that Annie Laurie was not her child, and told the whole family of us that her sister was dead and she was trying to finish raising her, that she and her brother was to see after her. * * * George always told us she was her sister's child, and we had no idea the child entered school under the name of Barrow."

Rosa Cavanaugh, wife of Eugene Cavanaugh, deceased, testified that shortly after Lou Harvey died George Ann took Annie Laurie and kept her until 1929 at which time she left her with the witness and her husband where she stayed until after George

Ann married William Barrow in 1931; that when George Ann brought Annie Laurie to her house in 1929 "George Ann simply told me to keep the baby until she could find a job and got a place for her to stay"; that while Annie Laurie was with the witness George Ann gave her money, food and clothes.

Mrs. Bess Mason, a disinterested witness, testified that George Ann worked for her for seven years and that she first saw Annie Laurie when she was about six years old; that George Ann told her "that her sister when she died gave her the baby and asked that she rear her as her child * * * and she told me Annie Laurie wasn't her own child, but had been adopted or taken over to rear as her own child * * * George told me when her sister died she gave her the baby to raise * * *. She wanted her to raise the baby. She gave her the baby to raise as hers"; that while Annie Laurie called George Ann "mama" she did not know what she called William; that while William was fond of the child she did not recall any words or conduct on the part of William indicating whether Annie Laurie "was either the real or adopted daughter of William Barrow. * * * He never intimated she was his child, or whose child."

The respondent herself testified that from her earliest recollection she had lived in the home of William and George Ann Barrow and that she did not know that she was not in fact their child until after George Ann died in 1947; that George Ann went with her when she was first enrolled in school and she was enrolled as "Annie Laurie Barrow" and she had never thereafter gone under any other name until she married; that George Ann would fill out a required card at the beginning of each school semester and would put her own name in the blank space designated "mother" and, in his presence, would put the name of William Barrow in the blank space designated "father"; that William and George Ann Barrow furnished her with a home, food and clothing and sent her to school and no one else contributed thereto; that when William was sick she took over George Ann's employment and gave them the money and helped to support them, giving them money and clothes; that when George Ann died she, as beneficiary, collected the proceeds of three insurance policies in which the relationship of the insured to the beneficiary was designated as that of mother.

Respondent introduced in evidence the school census cards for the years 1937 and 1938. The 1937 card gives the name of

the pupil as "Barrow, Annie Laurie", the name of the father as "Barrow, William" and the name of the mother as "Barrow, George Ann." The card is prepared for signing on a blank line under which this legend appears: "Parent, Guardian, or person rendering the child." The name "George Ann Barrow" appears on this line and a line is drawn through the words "Guardian, or person rendering the child" appearing in the legend, leaving the word "Parent." The 1938 card shows the name of the pupil as "Barrow, Annie Laurie", the name of the father as "Barrow, William" and the name of the mother as "Barrow, Georgia." The name "Barrow, Georgia" appears in the blank for signature and a line is drawn through the word "Parent" appearing in the legend under the signature leaving the words "Guardian or person rendering the child." The witness identifying the cards was unable to state whether the names and signatures were written in by the parties or by the census enumerator or by whom portions of the legend under the signature was stricken.

The principal of Anderson High School identified the permanent record card for that school of a student whose name was shown on the card as "Annie Laurie Barrow" and whose parents' names were shown as "Mrs. Georgia Barrow, William Barrow"; he "imagined" that the information on the card was received from Annie Laurie Barrow. A teacher in Keeling Junior High School identified the permanent record card in that school of Annie Laurie Barrow, and the card was introduced in evidence but it is not in the record and the record does not reflect what information it contained.

Respondent also introduced in evidence two insurance policies, one issued in 1935 and the other in 1943, in each of which the name "Annie Laurie Barrow" appears as insured and the name "George Ann Barrow" appears as beneficiary with the relationship of the beneficiary shown as "mother."

The question here is not whether the trial judge could have found the existence of the agreement as alleged from the evidence here summarized but whether he was compelled to do so; not whether the relevant facts and circumstances as established by the acts and conduct of the parties would authorize a logical inference that the agreement did exist but whether such facts and circumstances would permit of no other reasonable inference.

■ The rule is well settled that the judgment of a trial court

will not be set aside if there is any evidence of a probative nature to support it and that a court of civil appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. Liedeker et al v. Grossman et al, 146 Texas 308, 206 S. W. 2d 232; First State Bank of Temple v. Metropolitan Casualty Ins. Co. of New York, 125 Texas 113, 79 S. W. 2d 835, 98 A.L.R. 1256; 3-B Tex. Jur. 457, sec. 941. While proof of an ultimate fact by other relevant facts and circumstances may sometimes be so conclusive even in the absence of direct evidence as to compel a finding of its existence as a matter of law (see Gulf Oil Corporation et al v. Marathon Oil Co. et al 137 Texas 59, 152 S. W. 2d 711; Duke et al v. Houston Oil Co. of Texas et al, 128 S. W. 2d 480. Writ dism. judgment correct; 20 Amer. Jur. Sec. 1189, p. 1042) this will be true only where reasonable minds might not differ as to the inference to be drawn. Commercial Standard Ins. Co. v. Davis, 134 Texas 487, 137 S. W. 2d 1, 17 Tex. Jur. 907, et seq.

It may be conceded that the acts and conduct of George Ann Barrow are strong circumstantial evidence of the existence of the agreement sought to be established. We cannot say, however, that there are no facts and circumstances of probative value supporting a contrary inference. Respondent alleged that her mother delivered her to George Ann and that George Ann took her from her mother when she was but a few days old. There was testimony, however, that respondent was not delivered to any one by her mother and that no one took her until after her mother's death. The testimony of the witness Bess Mason viewed in its strongest light in support of respondent's claim is that George Ann told her "that her sister when she died gave her the baby and asked that she rear her as her child" and that "Annie Laurie wasn't her own child but had been adopted or taken over to rear as her own child"; yet there is evidence that while Lou Harvey had been in ill health, her death came suddenly from a heart attack,—"she fell dead when she died"—and that there was no one present at the time Lou fell dead except her father and her sister, Eula Swann. There is evidence that although living in the same house with her sister Eula Swann, who cared for her during her illness, Annie Laurie's mother never talked to this sister about raising Annie Laurie and the sister never heard her talk to anyone else about raising her. It is a circumstance worth noting that with many of her relatives about her while she was ill there is no evidence that Lou Harvey ever mentioned to any of them that George Ann had greed to take Annie Laurie and rear her as her own

child. The agreement to adopt is further negatived by the statement of George Ann, as testified to by the witness Rosa Barrow Stewart, to the effect that she "told the whole family of us that her sister was dead and she was trying to finish raising her, that she and her brother was to see after her". The evidence reflects that when Annie Laurie went to live with the Barrows at about seven years of age she was still bearing the surname of Harvey and it would not have been unreasonable for the trial court to infer that had there been an agreement to adopt made before the death of Annie Laurie's mother, Annie Laurie would have been given George Ann's surname of Whitley long before she went to live with the Barrows. While George Ann's name appeared to be signed to Annie Laurie's 1937 school census card as "Parent", her name appeared to be signed to the 1938 school census card as "Guardian, or person rendering the child," the word "Parent" being deleted where it appeared under the line for signature.

■ It would not have been unnatural when viewed in the light of common knowledge and experience for this aunt to take her orphaned infant niece and rear her to maturity, giving her all the care and advantages of which the aunt was capable, receiving in return that which was justly due in the way of affection and normal services, without any agreement or intention on the part of the aunt to adopt the child and thereby make her a legal heir to property. Some one had to care for the respondent or she would have become a charge upon the public. The question here is raised, as is ordinarily true in such cases, when the lips of the alleged adopter have been sealed by death and in an effort to establish an interest in property. Such claims should be received with caution. Before one should be decreed to be the adopted child and heir of another in the absence of compliance with the statute prescribing a simple method of effecting the status, proof of the facts essential to invoke the intervention of equity should be clear, unequivocal and convincing. Niehaus v. Madden, supra; 2 C. J. S., p. 396, Sec. 26; 171 A. L. R. 1320.

Respondent has placed her principal reliance upon the decision of this Court in the case of Jones v. Guy et al, supra. The evidence in that case was every bit as strong and compelling as is the evidence in this case. It is worthwhile to note the disposition made of the case. At the conclusion of the evidence the trial court peremptorily instructed a verdict against the plaintiff. The Court of Civil Appeals after summarizing the evidence treated the question as one of fact, reversing and remanding the case for trial. 132 S. W. 2d 490. The judgment

of the Court of Civil Appeals was affirmed by this Court. Had the Court regarded the question as one of law, it would have been proper to render judgment for the plaintiff as was done by the Court of Civil Appeals in this case.

■ In our opinion the state and nature of the evidence introduced on the trial of this case was such that reasonable minds might differ as to whether George Ann Barrow made an agreement with Lou Harvey to adopt respondent. The trial court found the issue against respondent. The Court of Civil Appeals had before it no assignment that the evidence was insufficient to support the judgment. That court treated the question as one of law based upon the absence of evidence in support of the judgment. It follows from what we have said that the Court of Civil Appeals erred in reversing the judgment of the trial court and rendering judgment establishing respondent's status as that of an adopted child of George Ann Barrow.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion delivered January 3, 1951.

Rehearing overruled February 21, 1951.